In the ESTATE OF Marjorie J. KILBOURN, Plaintiff.

Wayne F. KILBOURN, Respondent,

v.

George E. McINTYRE, Personal Representative of the Estate of Marjorie J. Kilbourn, Appellant.

No. WD 48967.

Missouri Court of Appeals, Western District.

March 7, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1995.

Application to Transfer Denied June 20, 1995.

**584**

Donald E. Raymond, Kansas City, for appellant.

Timothy J. Murphy, Kansas City, for respondent.

Before SPINDEN, P.J., and LOWENSTEIN and ELLIS, JJ.

SPINDEN, Presiding Judge.

When Wayne F. Kilbourn's wife died, he made a claim against her estate as a business creditor for his labor and services performed on his wife's property. A jury awarded him $225,000. The estate appeals, contending that the award violated an antenuptial agreement Kilbourn had made with his wife that he would not make any claim against her estate. We agree and reverse the trial court's judgment.

Wayne and Marjorie Kilbourn married on June 12, 1963.[2] Both owned real estate before marrying. They entered into an antenuptial agreement that each would relinquish "all statutory or other rights to the real or personal estate" of the other, "as surviving [spouse], heir at law or otherwise." The couple agreed that this applied to all property, "either presently possessed or hereafter acquired."

Kilbourn acknowledged the agreement at trial and asserted that its purpose was to help the parties keep their property and estates separated. He conceded that he had waived any right to a claim against his wife's estate, but he asserted that it did not contemplate business claims.

In 1968, after marrying, the couple agreed to a division of responsibilities. Kilbourn described this oral agreement in his answer to interrogatories:

... Wayne Kilbourn agreed to:

  a. Furnish all labor (personally or through hired help, supervised by him) on Marjorie Kilbourn's properties, whether rental properties or sale properties.

  b. Obtain, advance payment for, and deliver repair and building supplies.

2. Kilbourn testified that the couple married on June 12, 1963. The antenuptial agreement is dated June 12, 1964.

c. Rent or otherwise provide warehouse space for storage of supplies.

d. Furnish machinery and equipment.

Marjorie Kilbourn agreed to:

a. Pay real estate taxes and income taxes, and preparation charges for tax returns.

b. Pay insurance premiums, although after about 1970 many of the properties were self-insured.

c. Balance check book and prepare ledger pages for some house sales, including closing them.

It was mutually understood:

a. An accounting would be done periodically, for purpose of determining whether either party was entitled to be paid for a difference in the amounts incurred or expended.

b. The difference calculated by the accounting would be paid by the other party.

The couple also made an oral agreement that Marjorie Kilbourn would collect payments on her husband's property.

Marjorie Kilbourn died on July 11, 1991. Wayne Kilbourn filed a claim against her estate for $500,000 on January 24, 1992. He sought reimbursement for his labor and for the use of his equipment and warehouse.

The trial court ruled that the claim was an adversary probate proceeding, and it ordered Kilbourn to amend his claim to conform to the Missouri rules of civil procedure. When Kilbourn filed his amended petition on October 28, 1992, he asserted three theories of recovery: (1) breach of contract, (2) breach of implied contract, and (3) *quantum meruit.* He prayed for a judgment of $771,600.

The estate countersued. In its petition, it averred that if Kilbourn was entitled to recover for breach of implied contract or *quantum meruit,* the estate was entitled to $775,-000, the alleged value of Marjorie Kilbourn's performance of the couple's agreement. It also sued under a theory of breach of an implied contract or *quantum meruit.*

Evidence at trial established that Kilbourn's work on his wife's property included repairing and servicing electrical, plumbing and heating systems; roofing; laying carpet and floor vinyl; repairing windows and doors; installing alarm systems; supervising workers; collecting rental payments and overseeing legal matters. Kilbourn also rented warehouse space to store his equipment, and he used this equipment to work on his wife's property.

Kilbourn asked for $478,400 for labor and equipment. He estimated that he had worked an average of 30 hours a week on his wife's property. He valued his labor at $300 a week and the use of his tools and equipment at $100 a week. To this he added $121,686.97 in unreimbursed contract labor and expenses and $119,600 for unreimbursed expenses for supplies.

Marjorie Kilbourn's records indicated that from 1968 to 1991 she reimbursed her husband for some of his expenses in tending to her property. The records also showed that accountings had been made from 1966 to 1976 and that the couple reimbursed each other for some expenses in lump sums. The records indicated that after 1976 the couple reimbursed each other as expenses accrued. When Wayne Kilbourn would give his wife a receipt, she would write him a check for the amount, even if the amount was small. The records established that Marjorie Kilbourn collected mortgage and rental payments from her husband's property. When she received the payments, she applied the payments to her husband's taxes and insurance on the property. During their marriage, she paid $82,932.30 in real estate taxes, $40,222.27 in insurance, and $248,219.91 in income taxes on her husband's property. The record does not establish whether she obtained reimbursement for all these payments.

Marjorie Kilbourn did not reimburse her husband for his labor, nor did he reimburse her for her labor. Kilbourn did not bill his wife for compensation for his labor. When he borrowed money from his wife, he did not decline to repay her on account of her owing him money for his labor. At trial, Kilbourn opined that his wife did not know that she owed him so much money because she never took the time to figure the amount.

At the close of all the evidence, the estate moved for a directed verdict. The trial court

directed a verdict for the estate as to Kilbourn's express contract claim. The trial court noted that Kilbourn was no longer asking to submit his case on a claim of *quantum meruit;* thus, the only remaining claim, besides the estate's counterclaim, was Kilbourn's implied contract claim. The trial court denied the estate's request for a directed verdict as to this claim, and the jury returned a verdict for Kilbourn on this claim and ruled against the estate on its counterclaim. The estate filed a motion for judgment notwithstanding the verdict and, in the alternative, a motion for new trial. The trial court denied both on January 20, 1994, and the estate appealed. The estate did not appeal the adverse judgment on its counterclaim.

On appeal, the estate contends that the trial court erred in denying its motion for directed verdict at the close of all the evidence and its motion for judgment notwithstanding the verdict because Kilbourn waived his right to assert a claim against the estate by signing and agreeing to the antenuptial agreement. Kilbourn counters by asserting that the 1968 agreement to divide responsibilities "had the effect of expanding upon, possibly abandoning in some respects, and otherwise modifying the [antenuptial] agreement." We agree with the estate.

Kilbourn acknowledged the validity of the antenuptial agreement in his pleadings and in his testimony. In his petition, he averred that an "antenuptial agreement was executed prior to the marriage[.]" The petition also said, "Because of the terms of said antenuptial agreement and the adherence to its terms by ... Wayne F. Kilbourn and ... Marjorie Kilbourn, said parties did not have a family relationship regarding their business affairs."

The estate responded to Kilbourn's petition by affirmatively stating that he had "waived his right to any claim against the Estate and has by the antenuptial agreement contractually agreed not to make any claim against the Estate." Kilbourn filed a general denial in response to these averments. He did not plead *recision* or modification of the antenuptial agreement as an affirmative avoidance.

The same rules and principles of civil procedure which require a party to plead specifically an affirmative defense also require that a party specifically plead matters of affirmative avoidance. Rule 55.01 says, "A defense consisting of an affirmative avoidance to any matter alleged in a preceding pleading must be pleaded." Rule 55.08 says, "In pleading to a preceding pleading, a party shall set forth all applicable affirmative ... avoidances.... A pleading that sets forth an affirmative ... avoidance shall contain a short and plain statement of the facts showing that the pleader is entitled to the ... avoidance." In *Jaycox v. Brune,* 434 S.W.2d 539, 547 (Mo.1968), the Supreme Court of Missouri said, "[A] reply should be filed when a plaintiff desires to avoid or affirmatively attack new and affirmative matter alleged in the answer. In that reply he should distinctly allege his grounds of avoidance." An affirmative defense is waived if the party raising it does not plead it. *Detling v. Edelbrock,* 671 S.W.2d 265, 271 (Mo. banc 1984).

Kilbourn counters that because the purpose of requiring affirmative defenses to be pleaded is to give the other party notice, *Lucas v. Enkvetchakul,* 812 S.W.2d 256, 263 (Mo.App.1991), the estate's assertion is without merit because it had notice that his claim was based on an agreement subsequent to the antenuptial agreement. We agree that the estate had notice that he was relying on the 1968 agreement, but it did not have notice that he was claiming that the 1968 agreement amended the antenuptial agreement. Matters seeking avoidance of a valid contract are affirmative defenses and must be set out in the pleadings. *Semo Grain Company v. Oliver Farms, Inc.,* 530 S.W.2d 256, 258 (Mo.App.1975).

Kilbourn pleaded and tried his claim on a theory that, although the antenuptial agreement was in effect, it did not apply to the couple's business affairs. He alleged in his petition that the 1968 agreement created a substantial separation of their business ventures and property and that the antenuptial agreement prevented the parties from having a family relationship regarding their business affairs. He never contended that

the parties intended to, or did, rescind or modify the antenuptial agreement. When the estate alleged that Kilbourn had waived his right to make a claim against the estate, Kilbourn had a duty to allege specifically in his reply any additional facts he claimed made the antenuptial agreement inapplicable. His failure to allege modification or recision as an affirmative avoidance waived his right to assert that claim after trial.

 Nonetheless, even if he had affirmatively pleaded his claim that the antenuptial agreement had been modified, he should not have prevailed. Sections 451.220 and 432.010,[3] RSMo 1994, require contracts in consideration of marriage and affecting property to be in writing. The 1968 agreement was oral and, therefore, could not prevent enforcement of the antenuptial agreement as written. *Holt v. Story,* 642 S.W.2d 394, 396 (Mo.App.1982). Although parties to a written contract governed by the statute of frauds may orally rescind or abandon the written contract, *In re Estate of Reed,* 414 S.W.2d 283, 286 (Mo.1967), Kilbourn presented no evidence supporting any notion that he and his wife rescinded or abandoned the antenuptial agreement. To the contrary, Kilbourn maintained in his pleadings and at trial that the antenuptial agreement remained in effect. He sought to restrict the antenuptial agreement's application to "personal," as opposed to business, affairs. The antenuptial agreement's language was clear and unambiguous; it barred claims against the estate as "surviving [spouse], heir at law or otherwise." The "otherwise" catch-all surely included Kilbourn's claims as a business creditor, and the commissioner should have so ruled. The trial court erred in not directing a verdict for the estate.

■ Kilbourn contends, alternatively, that even if the antenuptial agreement blocked his claim, the estate did not establish the antenuptial agreement's validity. He argues that the estate did not show that he intentionally relinquished a known right to make a contract claim against his wife's estate. We disagree.

The antenuptial agreement said, "[E]ach party hereto enters into this agreement with a full knowledge as to the extent and proba-ble value of the estate of the other, each having made a full disclosure to the other, and each being fully advised to the rights conferred by law upon her or him by virtue of the contemplated marriage...." At trial, Kilbourn acknowledged that when he signed this agreement he knew that he was waiving his right to make a claim against his wife's estate. His contention is without merit.

Because this is a sufficient basis for us to reverse the judgment of the trial court, we need not consider the other points of error raised by the estate on appeal. The antenuptial agreement barred Kilbourn's claim against his wife's estate; therefore, we reverse the trial court's judgment.

All concur.

---

**3.** Missouri's statute of frauds.