

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00369-CV

| | | |
|---|---|---|
| Betty Lou Bradshaw | § | From the 355th District Court |
| | § | |
| v. | § | |
| | § | of Hood County (C2007009) |
| Steadfast Financial, L.L.C., R.J. Sikes, Roger Sikes, Kathy Sikes, Greg Louvier, Pam Louvier, Christy Rome, Dacota Investment Holdings, L.L.P., a/k/a Dacota Investment Holdings, L.P., Range Production I, L.P., Range Resources Corporation, Peter G. Bennis, Ronny D. Korb, and R. Crist Vial | § | |
| | § | |
| | § | February 14, 2013 |
| | § | |
| | § | Opinion by Justice McCoy |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in part of the trial court's judgment. It is ordered that the judgment of the trial court is affirmed in part and reversed in part. We affirm that portion of the trial court's judgment that granted summary judgment for Peter G. Bennis and Ronny D. Korb. We reverse that portion of the trial court's judgment

that granted summary judgment to Steadfast Financial, L.L.C., Range Production I, L.P., Range Resources Corporation, R.J. Sikes, R. Crist Vial, Roger Sikes, Kathy Sikes, Greg Louvier, Pam Louvier, Christy Rome, and Dacota Investment Holdings, L.L.P. a/k/a Dacota Investment Holdings, L.P., and remand this case to the trial court for further proceedings consistent with this opinion.

It is further ordered that the parties shall pay their own costs of this appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bob McCoy



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00369-CV

BETTY LOU BRADSHAW APPELLANT

V.

STEADFAST FINANCIAL, L.L.C., APPELLEES
R.J. SIKES, ROGER SIKES, KATHY
SIKES, GREG LOUVIER, PAM
LOUVIER, CHRISTY ROME,
DACOTA INVESTMENT HOLDINGS,
L.L.P. A/K/A DACOTA INVESTMENT
HOLDINGS, L.P., RANGE
PRODUCTION I, L.P., RANGE
RESOURCES CORPORATION,
PETER G. BENNIS, RONNY D.
KORB, AND R. CRIST VIAL

------------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## OPINION

------------

3

# I. Introduction

In four issues, Appellant Betty Lou Bradshaw appeals the trial court's summary judgments for Appellees Steadfast Financial, L.L.C. (Steadfast); Range Resources Corporation and Range Production I, L.P. (collectively, Range); R.J. Sikes, R. Crist Vial, Roger and Kathy Sikes, Greg and Pam Louvier, Christy Rome, and Dacota Investment Holdings, L.L.P. a/k/a Dacota Investment Holdings, L.P. (collectively, the Royalty Holders); Peter G. Bennis; and Ronny D. Korb. We affirm in part and reverse and remand in part.

## II. Factual and Procedural Background

### A. Prior Appeal

In a prior appeal involving these parties, we stated the following:

> Bradshaw is the holder of a non-participating royalty interest (NPRI)[1] in approximately 1,800 acres in Hood County that she inherited from her parents, J.A. and Lota Fay Driskill. The Driskills reserved the royalty interest in two deeds that they executed in 1960 (the "1960 Deeds").

---

[1]An NPRI is

> an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the [b]onus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by the owner of the mineral fee estate.

Lee Jones, Jr., *Non-participating Royalty*, 26 Tex. L. Rev. 569, 569 (1948). The leasing privilege is commonly referred to as the "executive right," and an NPRI "may [b]e created by grant or reservation either prior or subsequent to a lease of the land for oil and gas purposes." *Id.*

4

By 2006, . . . Steadfast owned the surface and mineral estates in approximately 1,994 acres in Hood County, of which the Driskills' reserved royalty interests covered 1,800 acres. Steadfast conveyed the surface estate to . . . Range Resources Corporation but reserved to itself all of the oil, gas, and other hydrocarbons in the 1,994 acres. At the same time, Steadfast entered into an oil and gas lease covering the 1,994 acres with . . . Range Production I, L.P.; the lease provided for a 1/8 royalty. Steadfast assigned portions of its royalty interest to . . . R.J. and Kathy Sikes, R. Crist Vial, [Greg and Pam] Louvier[], and Dacota Investment Holdings, LLP.[2]

In January 2007, Bradshaw filed suit, alleging that Steadfast breached its fiduciary duty to her by entering into the one-eighth royalty lease with Range Production I, L.P., when Steadfast owed her a duty to secure a one-fourth royalty in the lease. Bradshaw argued that she was entitled to a one-eighth royalty (1/2 of 1/4 lease royalty), rather than a one-sixteenth royalty (1/2 of 1/8 lease royalty) because, at the time Steadfast executed the lease to Range, the "going royalty rate in Hood County, Texas, was one-fourth."

The parties filed competing motions for summary judgment on whether the 1960 Deeds reserved a "fraction of royalty" or a "fractional royalty" interest. Range argued that Bradshaw's NPRI was a fixed one-sixteenth "fractional royalty" (1/2 X 1/8) and, therefore, no fiduciary duty was owed or breached. Bradshaw contended that the 1960 Deeds provided for a "fraction of royalty," such that her share of royalty could never drop below one-sixteenth but could be greater than one-sixteenth. Thus, if a future lease provided for a one-eighth royalty, she would get a one-sixteenth (1/2 X 1/8) share of production; if it provided for a one-sixth royalty, she would be entitled to a one-twelfth (1/2 X 1/6) share of production.

*Range Res. Corp. v. Bradshaw (Bradshaw I)*, 266 S.W.3d 490, 491–92 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g) (footnotes omitted). The trial court agreed with Bradshaw, holding that the royalty interest reserved in the 1960 Deeds was a "fraction of royalty" interest, and we affirmed. *Id.*

---

[2]Steadfast also assigned portions of its royalty interest to Bennis and Roger Sikes, and Bennis conveyed one-eighth of his royalty to Korb.

**B. Bradshaw's Claims**

In April 2010, Bradshaw filed her first amended petition, renewing her argument that Steadfast, as the executive rights holder, breached its duty to her in the manner in which it negotiated and structured its April 27, 2006 transactions with Range by engaging in self-dealing, obtaining an excessively large bonus payment and above-fair-market-value price for the tract's surface by structuring the lease to substantially reduce the lease royalty reserved to one-eighth. Bradshaw alleged that because of Steadfast's perfidy, she had received one-sixteenth less of the royalty that she should have received, to her detriment, and that Range had conspired with Steadfast.

Bradshaw pleaded for a constructive trust on the royalty interest assigned by Steadfast to Bennis and the Royalty Holders, along with the portion of the royalty conveyed by Bennis to Korb; disgorgement by Steadfast; actual damages against Steadfast and Range as jointly and severally liable for Steadfast's breach of duty; exemplary damages from Steadfast and Range; reformation of the lease; and a decree setting aside and canceling Steadfast's transfers and conveyances of its royalty interest as fraudulent. In her second amended petition, Bradshaw sought to impose a constructive trust on the accrued royalties and future payments of royalties to the NPRIs deeded by Steadfast and clarified that she also sought to set aside the transfer from Bennis to Korb as fraudulent.

6

## C. Summary Judgment Orders

On June 3, 2010, the trial court granted Bennis's no-evidence motion for summary judgment. The trial court also granted Korb's traditional and no-evidence motion for summary judgment against Bradshaw "on all grounds" on the same day. The trial court granted summary judgment for Steadfast and the Royalty Holders on their second motions for summary judgment before granting a final summary judgment in August 2010.[3]

In its final judgment, the trial court stated that it considered the following motions: Range's motion for summary judgment; Steadfast's third motion for summary judgment; the Royalty Holders' third motion for summary judgment; Bennis's second motion for summary judgment; Korb's second traditional and no-evidence motion for summary judgment; and Bradshaw's motion for reconsideration. It granted all but Bradshaw's motion. After acknowledging that it had already signed orders granting Bennis's, Korb's, Steadfast's, and the Royalty Holders' motions, the trial court found that all of Bradshaw's causes of action against these parties had been previously dismissed by summary judgment and ordered that Bradshaw take nothing from any of the appellees. This appeal followed.

---

[3]We addressed some of the parties' first motions for summary judgment in *Bradshaw I. See* 266 S.W.3d at 491.

## III. Summary Judgment

Bradshaw argues that the trial court erred by granting summary judgment for Steadfast, Range, the Royalty Holders, Bennis, and Korb.

### A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

### B. Steadfast's Summary Judgment

#### 1. Steadfast's Motion

In its second motion for summary judgment, Steadfast argued that Bradshaw could not complain of breach of a duty to her because the lease providing for a one-eighth royalty was specifically authorized by the language of the deed reservation and that Bradshaw's complaint was barred by estoppel by deed. To its motion, Steadfast attached the first request for admissions from it

8

and the Royalty Holders to Bradshaw, which contained as an attachment the 1960 Deeds; Bradshaw's responses to the first request for admissions agreeing that her NPRI claim was under the 1960 Deeds; and an affidavit from R.J. Sikes with a copy of the April 2006 contract of sale with Range.

In his affidavit, R.J. Sikes stated that he was Steadfast's managing member during all relevant time periods, that on April 27, 2006, Steadfast closed on the real estate transaction with Wise Assets No. 2, Inc. regarding the property at issue, and that Steadfast also closed with Range on the same day, conveying the surface estate to Range Resources Corporation and signing an oil and gas lease with Range Production. R.J. Sikes also claimed that Steadfast engaged in no self-dealing, conspiracy, or collusion in negotiating and entering the transaction with Range at arm's length and that Steadfast took no overriding royalty interest, no oil payment, and no bonus royalty.[4]

The April 2006 contract showed that Steadfast had sold the property for $8,976,600 in cash, that Steadfast had contracted with Gary Humphreys for an assignment of the contract that would allow the sale to go through, and that Steadfast had agreed to lease all minerals for a $7,505 per acre lease bonus and

---

[4]In an unnumbered issue contained in footnote 9 of her appellant's brief, Bradshaw complains that the trial court erred by overruling her evidentiary objections to Sikes's affidavit. However, we need not reach this argument because, even assuming that the trial court did not err by considering Sikes's affidavit in light of Bradshaw's objections, our resolution of Bradshaw's appeal turns on a question of law, and—as discussed below—based on our resolution of the legal question, Bradshaw has produced sufficient evidence to show that genuine issues of material fact remain in this case. *See* Tex. R. App. P. 47.1.

a 1/8 royalty.[5]  It also reserved a 3% overriding royalty interest to be assigned by Range to Jack Huff, Kyle Poulson, and Dustin Renfro.

## 2. Bradshaw's Response to Steadfast's Second Motion

In her response to Steadfast's motion, Bradshaw argued that Steadfast could have obtained a 1/4 royalty but instead reserved only a 1/8 royalty in exchange for the higher bonus payment it received, thereby breaching its duty to her.  Bradshaw attached to her response portions of Bennis's deposition, in which he explained how he and Humphreys became involved by contracting to purchase the land at issue from Wise Asset No. 2 and how he presented or spoke about the land to EXCO, Chesapeake Energy, EnCana, Peak Energy,

---

[5]The trial court held a hearing on July 1, 2010, to consider Steadfast's second motion.  Bradshaw objected that Steadfast's proposed order on the motion did not address some of her claims.  The trial court granted Steadfast's second motion after Steadfast filed its third motion to address any of Bradshaw's remaining claims.  Steadfast argued in its third motion that

> [t]o the extent additional cause(s) of action are asserted against Defendant Steadfast Financial, LLC. [sic] by Plaintiff, *all such causes or claims for relief are derivative of Plaintiff's assertion that such Defendant's conduct in entering into the oil and gas lease with Range Production I was a breach of a "fiduciary" duty*.  Such claim has been determined by the Court's granting of Defendant Steadfast Financial, LLC's Second Motion for Summary Judgment.  The absence of any actionable breach of duty by Steadfast Financial, LLC negates a requisite elements [sic] of each of the other claims that Plaintiff has asserted or which could be read to be asserted in her live pleadings, namely:  declaratory relief, unconscionable conduct, interference with property rights, reformation, disgorgement and/or exemplary damages.

[Emphasis added.]

10

XTO, Devon Energy, Burlington Resources, and Quicksilver. Bennis said that Chesapeake made what he thought was a serious offer and that lease rates at the time ranged from 1/8 to 1/4. Bennis also said that Steadfast had been willing to offer a $200,000 bonus and a 1/4 royalty rate on the NPRI that he and Humphreys had planned to retain at the property's sale, based on an April 12, 2006 email from David Shipman to Humphreys, but he said that the actual lease Steadfast signed had been for a 1/8 royalty.

Bradshaw attached the assignments by Humphreys of his interest in the contract covering the affected land, first to Texas Shepco, LP and then to Steadfast. R.J. Sikes signed the agreements, and Shipman & Associates, P.L.L.C., which represented Texas Shepco and then Steadfast, issued checks to the seller for nonrefundable option fees. In an April 12, 2006 email from David Shipman that Humphreys forwarded to Bennis, Shipman stated the following:

> Steadfast is willing to enter into a lease agreement with [Humphreys] and honor a lease agreement for Bradshaw in the same amount in order for you to fulfill your fiduciary duty to Bradshaw as the executive mineral estate interest.
>
> *Steadfast is willing to offer a 25% [1/4] royalty interest lease agreement for your 1/16 mineral estate and two hundred thousand as a bonus payment payable upon closing.* Attorney's [sic] for Steadfast and Range believe this is the best alternative to avoid litigation regarding the Bradshaw interest. [Emphasis added.]

In his deposition, Bennis described the April 17, 2006 meeting that included R.J. Sikes and several others:

11

[The contract] was set to close, apparently, to—with Range Resources buying the whole thing or the property and being the oil and gas company that would develop the minerals.

And I looked everyone in the eye and said, ["]Guys, this just isn't working. Gary Humphreys and I were supposed to get six and a quarter. . . . I understand Gary's in a little bit of a pickle. And I want to resolve this, but someone needs to give me some royalty.["]

And it didn't go very far, unfortunately. The brokers didn't have anything. R.J. didn't have anything other than what he had offered to Gary, and I didn't know who was getting what at that point. . . . I just knew that I should have been getting two and a half percent fixed royalty.

And at that point, I recall R.J. trying to come up with a way to—I don't know if he added a very small fraction of a royalty or something, but it got to 1.56, whatever that interest was that's in the agreement.

Bennis said that he and Humphreys were in agreement and resolved everything in the stipulation agreement, in which, on April 18, 2006, Steadfast agreed to convey an undivided NPRI of 1.5625% to Bennis, and in an election pursuant to the stipulation and amendment to the contract, Bennis agreed to accept $337,500 from Steadfast in addition to his royalty. In an April 18, 2006 email, Bennis told a third party, "Bottom line is that Range Resources is buying the whole deal land and taking a lease . . . . I was hoping for the Chesapeake deal but [Humphreys] screwed up a perfectly great opportunity for us all."

R.J. Sikes signed for Steadfast on April 27, 2006, issuing to Bennis his royalty deed for a 1.5625% NPRI after Bennis and Humphreys assigned all of their interests under the land sale contract to Steadfast. Bennis testified that he did not know from whom the portion of royalty that he received had been taken

12

but that no one at the April 17, 2006 meeting had seemed willing to give up some of his share. Bennis later conveyed to Korb 1/8 of 1% of his NPRI. Steadfast conveyed 2.028125% of its royalty interest to R.J. Sikes, 1.659375% to R. Crist Vial, 0.55% to Roger and Kathy Sikes, 0.25% to Greg and Pam Louvier, 0.10% to Christy Rome, and 0.10% to Dacota Investment Holdings, LP. Bradshaw's evidence also showed that Vial sent R.J. Sikes an undated letter acknowledging "if no lease, then no bonus of $250,000.00 in hand. (Note: None of which goes to Bradshaw)."

Bradshaw also attached several other 2006 lease agreements made in Hood County around the same time that included a 1/4 royalty and the affidavit of a landman working in the area in 2005 and 2006, who opined that the lease bonus paid to Steadfast was excessively high and that the reservation of a 1/8 royalty in the oil and gas lease between Steadfast and Range was artificially low. And she attached a 2005 fax to her from Chief Oil & Gas and from Collins and Young LLC containing a stipulation and offering to "lease the Wise Asset # LP interest for a 25% royalty which means [Bradshaw] will have a 12.5% net royalty interest" in the land covered by her royalty interest reserved in the 1960s Deeds.

Bradshaw argued that in light of the evidence set out above, particularly offers of a 1/4 royalty before the April 27, 2006 transaction, Steadfast's offer to Humphreys, the other oil and gas leases in Hood County in 2006 at various times after the April 27 transaction, and the 2005 offer from Chief Oil & Gas, there was

13

a genuine issue of material fact as to whether Steadfast breached its duty to her because it could have obtained a 1/4 royalty.

Bradshaw also claimed that with regard to the Royalty Holders, review of the April 27, 2006 transactions revealed that the transactions were inextricably intertwined and conditioned upon each other and that all of the royalty interests assigned, beginning with Bennis's, came directly from the 1/16 (1/2 of overall 1/8) lease royalty reserved by Steadfast to itself in its agreement with Range. Bradshaw contended that Steadfast had breached its duty to her and that she was therefore entitled to a greater share of whatever royalty should have been reserved, which would cut into what Steadfast could reserve to itself and then transfer to Bennis and the Royalty Holders.

### 3. Bradshaw's First Issue

In part of her first issue, Bradshaw argues that the trial court erred by granting summary judgment for Steadfast when Steadfast, as the executive rights holder, owed a fiduciary duty or duty of utmost good faith to her as an NPRI owner, and she contends that the summary judgment evidence raises a genuine issue of material fact with regard to whether Steadfast breached this duty and that the affirmative defense of estoppel by deed does not apply because her position is not inconsistent with any grant in the deeds. Relying on *National Plan Administrators, Inc. v. National Health Insurance Co.*, 235 S.W.3d 695 (Tex. 2007), Steadfast responds that the parties to the 1960 Deeds limited the existence and extent of any duties owed under the common law by specifying

14

that any lease "shall provide for Royalty of not less than one-eighth," that it fulfilled this duty, that it owed Bradshaw nothing more, and that Bradshaw's complaint is barred by the affirmative defense of estoppel by deed.

### a. Duty to NPRI Owner

We will begin our analysis with a review of *National Plan Administrators*. In that case, the supreme court addressed whether an insurance company was owed a general fiduciary duty by the entity with which it had contracted at arm's length to perform third-party administrator duties for its cancer insurance policies. *See id.* at 697–98. NPA, the administrator, argued that it did not have a general fiduciary duty to the insurer under the insurance code's specific provisions, the insurance code's general structure, or the parties' agreement and that the specific fiduciary duties that it owed the insurer were limited by their agreement. *Id.* at 699–700.

The court reviewed the general law pertaining to fiduciary duties, stating that the existence of a fiduciary duty is a question of law and that such duties are "imposed on parties to certain relationships based on the special nature of the relationships," before turning specifically to agency relationships. *Id.* at 700 (citations omitted). The court noted that in an agency relationship, all aspects of the relationship must be considered when determining the nature of fiduciary duties flowing between the parties and that, because "[u]nless otherwise provided by statute or law, duties owed by an agent to his or her principal may be altered by agreement," the substance of the parties' agreements must also be

15

considered in determining the scope of an agent's fiduciary duty to its principal. *Id.* at 700, 702–03.

After reviewing the insurance code, the court held that neither the code nor its structure created a general fiduciary duty applicable to third-party administrators. *Id.* at 701. The court then considered the parties' detailed agreement, which specified that NPA was an independent contractor whose activities in administering and marketing insurance products were not exclusive to the insurer, before declining to impose a general fiduciary duty on NPA "when the parties expressly agreed that [the administrator] could take actions that would be in violation of such a duty." *Id.* at 703 (reiterating that the contract arose from an arm's-length business transaction, that the insurer was experienced in negotiating agreements in the insurance industry and was represented by experienced employees and counsel when it entered the agreement, and that the parties agreed that NPA would act as the insurer's agent only for specific purposes).

This insurance administrator case is not on-point when compared to the extensive body of law specifically addressing the executive right holder's duty to nonexecutives. *See, e.g.*, *Manges v. Guerra*, 673 S.W.2d 180, 181, 183 (Tex. 1984) (op. on reh'g) (stating that the duty of utmost good faith owed by an executive has been settled since 1937). Therefore, we will trace the development of this particular body of law in order to determine what duty, if any, the executive rights holder owes to an NPRI owner.

16

### (1) Development of the Executive's Duty—*Schlittler* to *Manges* (1937–1984).

We begin our review with *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543 (1937), a deed construction case in which the commission of appeals determined that the reservation at issue was an NPRI before observing that as to the relationship between the executive rights holder and the nonexecutive, "self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved. Of course, there should be the *utmost fair dealing* on the part of the grantee in this regard." *Id.* at 544–45 (emphasis added). The supreme court adopted the opinion. *Id.* at 545*.*

### (a) Implied Covenant Theory

The "utmost fair dealing" language entered the mineral interest lexicon in *Schlittler*, but the basis for the duty of utmost fair dealing was unclear. In 1959, we concluded that the executive rights holder's duty to an NPRI owner arose from an implied covenant. *See Eternal Cemetery Corp. v. Tammen*, 324 S.W.2d 562, 564–65 (Tex. Civ. App.—Fort Worth 1959, writ ref'd n.r.e.); *see also Kimsey v. Fore*, 593 S.W.2d 107, 111 (Tex. Civ. App.—Beaumont 1979, writ ref'd n.r.e.); *Portwood v. Buckalew*, 521 S.W.2d 904, 911 (Tex. Civ. App.—Tyler 1975, writ ref'd n.r.e.).

*Tammen* involved placement of a cemetery, which would have, at the time, prevented mineral exploration and production. 324 S.W.2d at 564. We stated that this would render worthless any mineral interest as well as the appellees'

NPRI, thereby entitling the appellees to an injunction. *Id.* We based our conclusion on an implied contract between the parties owning respective interests in the estates of land, including the surface, "to so exercise their respective rights therein as to avoid injury to the rights of the other parties," and we referenced the definitive (at the time) article on NPRIs. *Id.* at 564–65 (citing Jones, 26 Tex. L. Rev. at 580, for the proposition that owners of respective interests in land may owe affirmative duties to each other).

Jones's 1948 NPRI article recognized the potential legal underpinnings after *Schlittler* for the executive's duty, noting,

> It seems clear that the Texas courts will not leave the royalty owner completely at the mercy of the holder of the exclusive-leasing privilege. However, the authorities cited indicate that the law on the subject is in the formative stage and has not yet developed to the point where a clear concept of the exact nature of the relation and duties can be ascertained therefrom. Some of the cases indicate that a fiduciary standard of conduct will be required on the theory that the relation of principal and agent or trustee and *cestui que* trust exists. . . . To apply the strict fiduciary standard applicable to trustees or agents would do violence to the intention of the parties and to the accepted trust and agency concepts. On the other hand, there is ample basis for the recognition of implied covenants. The parties to a non-participating royalty grant or reservation do not contemplate or intend the imposition of the extremely strict *fiduciary* standard of conduct. However, it will be demonstrated that the royalty owner will not be fully protected if he must rely entirely upon the ordinary principles of contract law requiring only *ordinary* good faith, prudence, and diligence. It is believed that the courts will arrive at a compromise between the two extremes and develop a concept which will, to some extent, partake of both theories, and, while recognizing certain implied covenants, will require a standard of conduct in the satisfaction thereof, which will approach, but not reach, the strict fiduciary standard: *It is in this sense that the phrase*, "utmost fair dealing," *is used herein to denote the standard of conduct required to satisfy the various implied covenants*.

18

26 Tex. L. Rev. at 573–74.

In *Portwood*, over a decade after *Tammen*, the Tyler court based its fiduciary duty finding on an implied covenant, as well as on the parties' circumstances, which involved a cotenancy among family members. 521 S.W.2d at 911 ("[T]here is an implied covenant arising from the partition deed that the appellant would use the utmost fair dealing in executing oil and gas leases so as to protect the interest of the appellee's children.").

Four years later, the Beaumont court in *Kimsey* relied in part on *Portwood*. 593 S.W.2d at 111. In *Kimsey*, a jury found that the executive rights holder, aided and abetted by others (including the lessees), failed to use utmost good faith and fair dealing and effectively caused the loss of the NPRI owners' rights under the term royalty deed when the evidence showed, among other things, that the executive had initially declined to lease until the outstanding term royalty terminated and that once he signed a lease, he gave the operators instructions not to drill until the month after the outstanding term royalty expired. *Id.* at 108–09. The jury had been instructed that "the duty to use utmost fair dealing and diligence in the exercise of the exclusive-leasing privilege arises out of a contractual relationship with the plaintiffs under implied covenants in the non-participating term royalty deeds." *Id.* at 110 n.4.

After the trial court granted to the defendants a judgment notwithstanding the verdict, the NPRI owners appealed, and the Beaumont court reviewed the then-existing case law, including *Portwood,* before stating, "We are satisfied that

the test of utmost fair dealing is an implied covenant arising from the royalty deed which is imposed upon the owners of the executive right to lease." *Id.* at 111. The court reasoned that it was necessary to imply such a covenant "in order to give effect to and effectuate the purpose of the contract as a whole," and that the record in the case was "a concrete illustration of the absolute necessity of such an implied covenant." *Id.* at 112. Therefore, at least until the supreme court's 1984 opinion in *Manges*, the legal theory for the duty of utmost fair dealing by the executive rights holder was based on an implied covenant to protect the NPRI owner's interest.

### (b) From Implied Covenant to Relationship

The supreme court took an intermediate step on the way from an implied covenant to a duty based on the parties' relationship thirty years after *Schlittler*, when it elaborated upon the type of relationship that exists between an NPRI owner and the executive rights holder in *Andretta v. West*, 415 S.W.2d 638 (Tex. 1967). In *Andretta*, West conveyed an undivided 1/4 NPRI to Andretta's predecessor in 1942, after he had executed a lease on his property but before he amended the lease in 1944 to provide for a substitute royalty payment in lieu of the actual royalty covered by the lease. *Id.* at 639–41. Andretta did not learn of the amendment or payments to West until around 1957. *Id.* at 639. The court found that as to West and Andretta, there was both privity of contract *and* a confidential relationship between the parties necessary to hold West accountable

for the 1/4 of compensatory royalty payments to which Andretta was entitled, reasoning as follows:

> The holder of the executive right has the power to make and amend leases affecting the enjoyment of a non-participating royalty interest owned by another. It was in the exercise of such power that respondents amended the lease to provide that the same might be maintained by the payment to them of the full compensatory royalty. The owner of a non-participating royalty interest would not ordinarily learn of such an arrangement unless he was advised by one of the parties. *When we consider the power entrusted to respondents and their superior knowledge, it is clear to us that they were in a confidential relationship with petitioner in so far as the lease amendment and the payments thereunder are concerned*.

*Id.* at 641 (emphasis added). That is, based on the terms of the deed and the existence of the lease at the time the NPRI was granted to him, Andretta was entitled to share in the compensatory royalty payments made to West, the executive rights holder. *Id.*; *see also HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) (stating that in *Andretta*, the court held that a fiduciary relationship existed between the executive rights owner and NPRI owners in Andretta's position because the former had the power to make and amend the lease, thereby affecting the latter's rights). And a year before the court handed down *Manges*, Justice Spears noted in a concurring opinion that Texas courts have read a duty of good faith and fair dealing into many types of contractually based transactions, with the common thread being that there is a special relationship between the parties arising either from the element of trust necessary to accomplish the goals of the undertaking or imposed by the court because of an imbalance of bargaining power. *English v. Fischer*, 660 S.W.2d

21

521, 524 (Tex. 1983) (Spears, J., concurring).  Justice Spears cited *Schlittler* for the proposition that the executive rights holder owes a duty of utmost fair dealing to the holder of a royalty interest, stating that this duty arises from the relationship and not from the contract.  *Id.* at 524–25.  Thus, as of 1983, the supreme court began moving in the direction of the relationship between the parties rather than an implied covenant.

### (c) Relationship Theory

In *Manges*, the supreme court's quixotic, groundbreaking 1984 case, the Guerra family sued Manges both for failing to exercise diligence in leasing the minerals to third persons and for leasing a portion of the minerals to himself at terms unfair to the Guerras.[6]  673 S.W.2d at 181.  The court described the duty owed by the executive as follows:

> The duty of utmost good faith owed by an executive has been settled since *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, 545 (1937).  That standard has been repeated in *First National Bank of Snyder v. Evans*, 169 S.W.2d 754, 757 (Tex. Civ. App.—Eastland 1943, writ ref'd); *Kimsey v. Fore*, 593 S.W.2d 107, 111 (Tex. Civ. App.—Beaumont 1980, writ ref'd n.r.e.); *Portwood v. Buckalew*, 521 S.W.2d 904, 911 (Tex. Civ. App.—Tyler 1975, writ ref'd n.r.e.); and *Morriss v. First National Bank of Mission*, 249 S.W.2d 269, 276 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e.).  The fiduciary duty arises from the relationship of the parties and not from the contract.  *See English v. Fischer*, 660 S.W.2d 521, 524–25 (Tex. 1983) (Spears, J., concurring).  *While a contract or deed may create the relationship, the duty of the executive arises from the relationship*

---

[6]The deeds under which Manges obtained the executive right provided that he was not to lease the Guerras' mineral interest for less than a 1/8 royalty and that the Guerras were to participate in all bonuses, rentals, royalties, overriding royalties, and payments out of production.  *Id.* at 181–82.

*and not from express or implied terms of the contract or deed*. That duty requires the holder of the executive right, Manges in this case, to acquire for the non-executive every benefit that he exacts for himself. R. Hemingway, The Law of Oil & Gas, § 2.2(D) (2d ed. 1983).

In our opinion Manges' conduct amounted to a breach of his fiduciary duty as found by the jury in making the lease to himself, in agreeing upon a $5 nominal bonus for 25,911.62 acres of land, and in dealing with the entire mineral interest so that he received benefits that the non-executives did not receive. His taking one hundred percent of seven-eighths of the three producing wells, his taking one-half of the working interest, free and clear of costs, by his farm-out to Schero, was also the receipt of special benefits that the non-executives did not receive. Upon the basis of his receipt of special benefits, we must cancel the lease as we did in *State v. Standard*, 414 S.W.2d 148 (Tex. 1967). In *Standard* we held that the surface owner, as the exclusive agent for the state in the execution of an oil and gas lease under the Relinquishment Act, could not reserve the right to acquire for himself at a later time a one-sixteenth share of the working interest, when the state was not accorded an equal right. *Id*. at 153. The Manges-to-Manges lease was correctly cancelled.

*Id*. at 183–84 (emphasis added). The court held that Manges's conduct amounted to a breach of his "fiduciary" duty, as previously found by a jury. *Id*. at 184. However, despite the court's relatively clear language, defining the executive's duty post-*Manges* has presented a conundrum because of the Guerras' status as co-tenants with Manges—a point that both Steadfast and Range rely upon in their appellate briefs before us. *See id*. at 181.

### (2) Refinement of the Duty Post-*Manges*, 1985–2003

After *Manges*, the Texas intermediate appellate courts focused to varying degrees on the relationship between the parties and the terms of the deed reservations. *See Hlavinka v. Hancock*, 116 S.W.3d 412 (Tex. App.—Corpus

23

Christi 2003, pet. denied), *disapproved of by Lesley v. Veterans Land Bd. of the State of Tex.*, 352 S.W.3d 479, 491 & n.78, 492 (Tex. 2011); *Luecke v. Wallace*, 951 S.W.2d 267 (Tex. App.—Austin 1997, no writ); *Dearing, Inc. v. Spiller*, 824 S.W.2d 728 (Tex. App.—Fort Worth 1992, writ denied); *Mims v. Beall*, 810 S.W.2d 876 (Tex. App.—Texarkana 1991, no writ); *Hawkins v. Twin Montana, Inc.*, 810 S.W.2d 441 (Tex. App.—Fort Worth 1991, no writ) (op. on reh'g); *Pickens v. Hope*, 764 S.W.2d 256 (Tex. App.—San Antonio 1988, writ denied); *Comanche Land & Cattle Co. v. Adams*, 688 S.W.2d 914 (Tex. App.—Eastland 1985, no writ). *Comanche*, *Pickens*, and *Mims* have provided the framework for the law as it has evolved in the intermediate courts, so we begin our analysis with these cases.

The Eastland court cited to *Manges* in *Comanche* when addressing whether the executive rights owner had violated a duty to the term NPRI owner. 688 S.W.2d at 915–16. The NPRI owner had reserved a 1/2 term royalty interest when he conveyed his land to Comanche. *Id.* at 915. When Comanche subsequently entered into a mining agreement that provided for *no* royalty—defeating the NPRI owner's rights—the court held that even though the mining agreement was not a "lease," this did not relieve Comanche of its duty of utmost good faith when the evidence showed that before the mining agreement was signed, Comanche had notice of the royalty reservation and could have entered into an oil and gas lease containing a royalty provision. *Id.* at 915–16.

24

More cautiously, in *Pickens*, the San Antonio court also addressed the duty owed by an executive rights holder to an NPRI owner, noting that "some kind of duty" is owed by the executive but that "there may be a variance concerning the standard to which the executive will be held in the exercise of his executive right." 764 S.W.2d at 257–58, 263–64. In *Pickens*, Hope's parents had reserved a term royalty providing for "an undivided 1/4 of the usual 1/8 royalty" when they conveyed the land to Pickens. *Id.* at 258–59. Pickens did not execute a lease until after Hope's royalty term had expired, after he had refused some offers to lease,[7] and a jury found that he had breached his duty of good faith and utmost fair dealing by failing to lease or develop the oil, gas, and other minerals. *Id.* at 259–60, 264.

On appeal, the parties disputed whether the standard of duty owed to the NPRI owner should be measured by a fiduciary duty arising from the parties' relationship under *Manges* or by the breach of an implied covenant arising out of the deed as held by the courts prior to *Manges*, and whether the standard to be

---

[7]Pickens had researched the land's mineral potential and learned that 98,000,000 barrels of recoverable tar could be produced. 764 S.W.2d at 259. He received an offer to lease for $10/acre cash bonus, a ten-year primary term, and a 1/8 royalty but refused it on the ground that the cash bonus was inadequate, the royalty too small, and other lease provisions were unacceptable. *Id.* He subsequently received an offer to lease for a cash bonus of $30–35 per acre, but he rejected this offer too, as well as one for a cash bonus of $269,000, a five-year primary term, a royalty of 17.5%, and an annual delay rental of $5 per acre, as well as an offer and counteroffer made after the lawsuit had been filed. *Id.* Only after Hope's royalty term had expired did Pickens execute a lease on the ranch; however, the lease excluded tar sands, the lessee drilled a dry hole, and the lease terminated for failure to obtain production of oil or gas. *Id.* at 260.

imposed should be (1) fiduciary, (2) good faith and utmost fair dealing, or (3) ordinary care and good faith. *Id.* at 258. The trial court had refused to give a fiduciary duty instruction and instead instructed the jury that the executive rights owner owed to the NPRI owner "the same degree of diligence and discretion in exercising the [executive] rights . . . as would be expected of the average land owner" motivated to take affirmative steps to seek or cooperate in leasing or development due to self-interest. *Id.* at 264, 267. The trial court instructed the jury that "[i]n the exercise of the executive rights, the holder thereof has a duty to use utmost good faith and fair dealing as to the interest of the non-participating royalty owner," and it defined "utmost fair dealing" as

> the same degree of diligence and discretion in exercising the rights and powers held by the executive owner as would be utilized by the average landowner seeking to obtain all the benefits that could be reasonably obtained for himself and for his non-participating royalty owner from a disinterested third party either (1) by leasing such lands for exploration or (2) developing such lands himself.

*Id.*

In concluding that Pickens did not owe Hope a "fiduciary" duty under *Manges*, the appellate court distinguished *Manges* on the basis of cotenancy and Manges's self-dealing. *Id.* at 266. It distinguished *Comanche* based on that case's specific NPRI reservation (a one-half royalty interest on all royalties that might be paid during the term of the reserved interest), as compared to the stated fractional NPRI reserved by Hope's parents. *Id.* at 267–68. The court reasoned that whereas in *Comanche*, the executive could control the amount of production

26

accruing to the royalty owner and so was in a position to manage and manipulate the share of production to which the non-executive would be entitled and could, by other provisions in the lease, obtain benefits that were not obtained by the non-executive, none of those possibilities existed as to Hope. *Id.* at 267. Hope's parents had reserved a stated fraction (1/32) as royalty, and "[i]n the event of production, Hope would receive a 1/64th free royalty, no more and no less, and this irrespective of who manages the lease or upon what terms were contained in a lease." *Id.*

The court stated,

> We do not interpret *Manges* to hold that in every case the executive owes a fiduciary duty to the non-executive. As noted, there, the executive (Manges) and the non-executive (the Guerras) were co-tenants in the mineral estate, and the benefits which the Guerras received were totally dependent upon how Manges managed the entire mineral estate. Under the facts presented in *Manges*, a relationship of trust and confidence between the parties was established which gave rise to a fiduciary duty on the part of the executive. In the case at bar, there is no co-tenancy in the minerals, and the relationship is that of fee mineral owner and non-participating royalty owner; the relationship of trust and confidence simply does not exist.

> . . . .

> A true fiduciary is bound to serve the primary interests of his principal and to subvert his own self-interests when they are in conflict. That relationship is not found here in the case of Pickens, who is charged with failure to lease or to develop his *own* property, who has *not* been entrusted with the executive management of royalties belonging to Hope, who has not taken any profits and benefits of any nature, and who has not engaged in self-dealing concerning the royalties owned by Hope.

27

*Id.* (citation omitted). The court concluded that as to Pickens, the proper standard was that of an ordinary, prudent landowner; that matters of cash bonus, primary term, delay rentals, and special provisions were matters of trading; and that

> as long as the executive acts in good faith and with reasonable regard for the interests of the non-participating royalty owner, his judgment in leasing or refusing to lease is not subject to question, and his refusal to lease, absent arbitrariness, connivance or deliberate action calculated to deprive the non-executive of his royalty interest, will not constitute a breach of duty owed the owner of the non-participating royalty.

*Id.* at 268–69;[8] *see also Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 591 (Tex. App.—Dallas 1994, orig. proceeding) (op. on reh'g) (relying on *Pickens* but without setting out terms creating NPRI). *But cf. Grinnell v. Munson*, 137 S.W.3d 706, 719 (Tex. App.—San Antonio 2004, no pet.) (acknowledging that "[t]he fiduciary duty owed by the holder of the executive right is to acquire for the non-executive every benefit that he exacts for himself.").

Finally, in *Mims*, the Texarkana court relied on the terms of the deed to determine what level of duty was owed to the NPRI holder. 810 S.W.2d at 879. The Bealls reserved an undivided 1/4 NPRI when they sold their land to John

---

[8]The San Antonio court reversed the trial court's judgment after holding that the evidence did not support the jury's finding that Pickens breached a duty to Hope of good faith and utmost fair dealing in failing to lease the land to another for mineral development or to develop the minerals himself and that there was no evidence that Pickens owed Hope a fiduciary duty or breached such a duty or that Pickens breached the duty of an ordinary, prudent landowner in failing to lease the land for tar production or in failing to produce the tar himself. *Pickens*, 764 S.W.2d at 271.

28

Mims. *Id.* at 878. The specific interest reserved was for "1/4 of whatever royalty is obtained and no less than 1/8." *Id.* at 879.

John's son Angus leased the minerals from John for a 1/8 royalty without cash bonus and then assigned the lease to Henderson Clay Products, Inc. in return for a 1/16 overriding royalty on the leasehold estate. *Id.* at 878. There was no negotiation between Angus and his father for the amount of the royalty, and John's testimony "indicate[d] that there was no arm's length transaction because he was willing to give it to his son if his son could get something out of it." *Id.* at 880. The Bealls sued, complaining that the 1/8 royalty was unreasonably low, constituting a breach of duty, and that Angus's overriding royalty interest was proof of the breach. *Id.* at 878. The jury found a breach of the duty of good faith and utmost fair dealing and awarded actual and exemplary damages for the Bealls, and the trial court entered judgment on the verdict and imposed a constructive trust on 1/4 of the 1/16 overriding royalty obtained by Angus through assignment of the lease. *Id.* at 878, 879.

The Texarkana court summarized the evolution of the law from *Schlittler* (setting out the duty of utmost good faith and fair dealing) and *Manges* (equating the utmost good faith standard with a fiduciary obligation) to *Pickens* (stating no duty to manage NPRI when a fractional royalty is involved) and *Comanche* (following *Manges* when the NPRI was a fraction of royalty). *Id.* at 878–79. It distinguished *Pickens* and analogized to *Comanche* on the basis of the Bealls' grant—no specific amount of royalty, but rather "1/4 of whatever royalty is

29

obtained and no less than 1/8," leaving the percentage up to the executive's efforts—before concluding that although the NPRI owners in *Manges* were also cotenants with Manges,

> [*t*]*he fact that the non-participating interest owners were cotenants of Manges did not create a fiduciary relationship in the absence of an agreement or contract providing for such. The significant relationship which gives rise to the fiduciary duty is the exercise of the executive rights over the non-participating interest. This fiduciary duty should apply when the executive controls only the amount of the royalty interest just as it does when the executive controls both the amount of the royalty interest and the bonus and delay rentals.*

> In *Manges*, the court held that the fiduciary duty is owed only in the area of the executive interest owner's duty to obtain appropriate benefits for the non-participating royalty holders. Furthermore, in *Manges*, the Supreme Court does not apply the customary standard that the fiduciary must subordinate its own interest to those of the non-participating interest owner, but instead charges the fiduciary with acquiring for the non-executive every benefit that he exacts for himself.

*Id.* at 879 (emphasis added) (citations omitted) (footnotes omitted).

The court concluded that evidence of John and Angus's conduct showed self-dealing and conspiracy to violate the fiduciary duty. *Id.* at 881–82. The court noted that when a lessee maintains an arm's length position in the transaction, he does not owe a fiduciary duty or duty of utmost good faith to the NPRI owner, but if he agrees with the executive "to an arrangement made for the purpose of excluding or minimizing the benefits of an outstanding or non-participating interest owner, the lessee can be held liable to the injured third party." *Id.* at 880–81. So while Angus, as a lessee, did not owe a fiduciary duty to the Bealls, he could be held liable to them as "a lessee who induce[d] or participate[d] in the

30

executive's breach." *Id.* at 880. The court upheld the trial court's judgment after reforming the total amount of actual damages. *Id.* at 882.

From these three cases, two new schools of thought began to emerge—one relying on the existence of cotenancy to support the existence of a fiduciary duty and the other resting primarily on the terms of the reservation itself and the exercise of the executive right. Under both theories, self-dealing appeared essential to find a breach of whatever duty was owed, and "fiduciary" did not necessarily mean fiduciary in the traditional agent-principal sense.

### (a) Cotenancy

In *Hlavinka*, a 2003 Corpus Christi case, Hancock and the other appellees, who were nonexecutive cotenant mineral interest owners, sued Hlavinka, a cotenant mineral owner and owner of the executive rights and the surface, for breach of fiduciary duty. 116 S.W.3d at 415. The basis for their suit was that when Hlavinka was approached about leasing, he held out for more because nearby properties were receiving both higher bonuses and higher royalty interests. *Id.* at 415–16. The court held that although Hlavinka owed Hancock and the other appellees a duty to acquire every benefit for them as he would acquire for himself, there was no breach here because there was no self-dealing, unlike in *Manges*, and Hlavinka did not withhold or fail to share money belonging to Hancock and the other appellees as cotenants in the mineral estate. *Id.* at 418–20. In a footnote, the court explained that

31

[u]ntil *Manges*, the utmost-good-faith standard had not been considered to create a fiduciary duty. *See Mims v. Beall*, 810 S.W.2d 876, 878 (Tex. App.—Texarkana 1991, no writ). Cases interpreting the *Manges* decision have concluded that when the executive and non-executive are co-tenants in the mineral estate and there is a relationship of trust and confidence between the parties, a fiduciary relationship exists between the executive and the non-executive mineral interest owner. *See Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 591 (Tex. App.—Dallas 1994, orig. proceeding); *Pickens v. Hope*, 764 S.W.2d 256, 267 (Tex. App.— San Antonio 1988, writ denied).

*Id.* at 417 n.3.

## (b) Terms of Deed Reservation

We addressed the issue, first in *Hawkins* in 1991 and then in *Dearing* in 1992, ultimately concluding that whether the parties were cotenants was irrelevant. Instead, we focused on the terms of the NPRI reservation to define the duty owed by the executive rights holder.

In *Hawkins*, the appellees, royalty owners, sought appointment of a receiver to enter into an oil and gas lease. 810 S.W.2d at 443, 445. After the appellees filed suit, but before the trial court could appoint a receiver, the appellant (who owned the surface, the executive right, and the right to receive all bonus and delay rentals) executed a lease with L.F. Jones Company. *Id.* The appellees argued that the appellant's executing this lease amounted to a breach of fiduciary duty because the appellant had executed it after refusing a better lease offer by Twin Montana.[9] *Id.* at 445. The trial court found that the Jones

---

[9]The Jones lease was for a primary term of two years, a 1/8 royalty, a bonus of $100 per acre, and surface damages of $3,000 for the first well and

lease failed to adequately protect the appellees and that the appellant had breached his fiduciary duty by entering into such a lease and appointed a receiver. *Id.*

With regard to the application of *Manges*, we stated:

> The Texas Supreme Court has held that a fiduciary relationship exists between the owner of the executive right and the royalty owner. *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984). Further, the executive owner owes a duty of utmost good faith to the royalty owner. *Id.* Appellants argue that courts and commentators have criticized the *Manges* decision. We do not need to consider this controversy because the action of the trial court was justified by the imposition of a duty of good faith. *See* Note, *Manges v. Guerra: The Executive Right Holder Undergoes Close Scrutiny*, 38 BAYLOR L. REV. 189, 194 (1986) (imposition of strict standard of utmost good faith not required under the facts of *Manges* or other cases concerning the executive owner's duty). Appellants do not have a duty to sacrifice their desire to protect the surface of the land, and they would be entitled to negotiate the best surface protection possible as long as they maintained good faith in their consideration of the royalty owners. The Jones lease contains a more generous payment for surface damage, but *we cannot say the trial court erred in holding appellants were not acting in good faith when they accepted a one-eighth royalty instead of a one-fourth royalty*.

*Id.* at 445–46 (emphasis added). Further, we held that although the appellant executed a lease with a 1/8 royalty, the deed containing the NPRI grant stated that any lease executed "shall always provide for a royalty of *at least* 1/8," and that "[c]ircumstances may require more than the minimum provided, to be acting in good faith." *Id.* at 446.

---

$1,000 per additional well. *Hawkins*, 810 S.W.2d at 445. The Twin Montana lease was for a primary term of one year and provided for a 1/4 royalty, a bonus of $100 per acre, and surface damages of $500 per well. *Id.*

In *Dearing*, the Haag family conveyed a 600-acre tract to Dearing in 1943 but reserved an undivided 1/2 interest in minerals, granted the executive right to Dearing, and provided that the royalty reserved was "no . . . less than the usual one eighth (1/8) royalty." 824 S.W.2d at 730. In 1944, Dearing entered into an oil and gas lease providing for a 1/8 royalty; this lease did not expire until the early 1980s. *Id.* Dearing then received several offers to lease the property, including an offer for a 1/4 royalty and bonus payments of $100/acre. *Id.* at 731. Dearing ultimately leased to a company related to himself for a 1/8 royalty and no bonuses. *Id.*

Spiller, the Haags' successor in interest, sued for breach of the duty of utmost good faith, cancellation of the lease, termination of Dearing's executive leasing rights over Spiller's mineral interests, and for an accounting of the profits made under the lease. *Id.* at 730–31. The jury found breach of the duty of utmost good faith and found that the lease was an act of self-dealing and that Dearing and the related company conspired to deprive Spiller of benefits he would have received in a lease to a disinterested party. *Id.* at 731. It assessed $300,000 in exemplary damages against each defendant. *Id.* The trial court's judgment on the verdict provided for cancellation of the lease, cancellation of Dearing's executive rights over Spiller's mineral interest, and establishment of Spiller as cotenant with Dearing with respect to the production on the premises, as well as an accounting. *Id.*

We held that the *Manges* standard of "utmost good faith" applied and observed that although Dearing claimed that the "facts in *Manges v. Guerra* are thousands of miles or light years removed from the facts of the instant case," it would be difficult to determine how a fact situation could actually be more analogous to the first cause of action in *Manges*. *Id.* at 732. We did not rely on the cotenancy factor but rather on the limitation on the executive right in the language of the reservations in both *Manges* and *Dearing* that no lease could be entered into that provided for less than a 1/8 royalty. *Id.* When "at least two parties made offers substantially better than the lease entered into by Dearing," the trial court properly entered judgment on the jury's verdict that Dearing had breached his duty of utmost good faith by entering into a lease with an "inside" party. *Id.* Our reasoning was as follows:

> Because the non-participating royalty owner must depend upon the mineral fee owner for the enjoyment of his interests, the courts have implied a covenant of utmost fair dealing in the exercise of the executive rights to lease or develop the minerals.

> A mineral fee owner has a possessory estate in the land. As such he has the exclusive power to lease the land to another for mineral development or to develop the minerals himself. On the other hand, a non-participating royalty owner has no possessory estate in the land, and hence, no right to lease the land to another for mineral development, nor does he have the right to produce the minerals himself.

> In *Pickens v. Hope*, 764 S.W.2d 256 (Tex. App.—San Antonio 1988, writ denied), the court of appeals distinguished *Manges* on the basis that in *Pickens* there was no duty to manage the non-participating royalty interest because the amount of that royalty was

35

specifically set out as 1/4 and could not be altered.[10]  However, in *Manges*, the executive rights holder had a duty to manage the interest by obtaining the highest royalty possible and was prohibited from self-dealing.  The court reached this determination from the language of the deed which specified that no royalty less than 1/8 was acceptable.[11]  Unlike *Pickens*, the present lease [sic] does not have or require a fixed royalty.  Instead, it contains the *Manges* language calling for a royalty of no less than 1/8.  Thus, the entire percentage return is left to the efforts of the executive.  We hold that as the language in the Haag/Dearing deed is the same as the language in the *Manges* deed, Dearing had a duty to manage the executive interest by obtaining the highest royalty possible, and was likewise prohibited from self-dealing.  Consequently, we hold that this duty was breached when the lease he awarded himself did not provide for at least the fair market royalty prevalent in the surrounding area at that time.

*Id.* at 732–33.

We also analogized to *Comanche* before stating that the fact that the NPRI owners were cotenants in *Manges* did not create the fiduciary relationship in the absence of an agreement or contract providing such—instead, "the significant relationship which gives rise to the fiduciary duty is the *exercise* of the executive rights over the non-participating interest." *Id.* at 733.  "The fact that Dearing was co-tenant with the plaintiffs is irrelevant to a determination of the duty owed by an executive.  If Dearing owned no interest in the land, and only owned the executive rights on the property, this duty would still be imposed." *Id.*; *see also Mafrige v. United States*, 893 F. Supp. 691, 703 (S.D. Tex. 1995) (citing *Dearing*, *Mims*, and *Comanche* for the proposition that the lower Texas courts since

[10]That is, it was a "fractional royalty."  *See Bradshaw I*, 266 S.W.3d at 493.

[11]That is, it was a "fraction of royalty."  *See id.*

36

*Manges* have found a fiduciary obligation whenever the amounts due on the NPRI are linked to the royalty negotiated by the holder of the executive interest instead of a fixed fractional amount in the deed), *aff'd*, 189 F.3d 466 (5th Cir. 1999), *cert. denied*, 529 U.S. 1053 (2000); Joshua M. Morse III and Jaimie A. Ross, *New Remedies for Executive Duty Breaches:  The Courts Should Throw J.R. Ewing Out of the Oil Patch*, 40 Ala. L. Rev. 187, 199 (1988) ("Where executives have power to increase their bonuses, surface damage payments, or other interests by decreasing the royalty interest, they have the power to diminish significantly the value of nonparticipating royalty interests." (footnote omitted)).

In an article we also referenced in *Bradshaw I*, *see* 266 S.W.3d at 493, Phillip E. Norvell made a similar observation after referencing *Dearing*, *Mims*, *Pickens*, and *Comanche*, concluding that the amount of the executive's control over the lease benefits is determinative as to whether the *Manges* fiduciary standard applies and that it applies to a mineral owner with the executive right when a fraction of nonparticipating royalty is involved, in contrast to the "utmost fair dealing" standard, which would apply to a fractional NPRI.  Phillip E. Norvell, *Pitfalls in Developing Lands Burdened by Non-Participating Royalty:  Calculating the Royalty Share and Coexisting with the Duty owed to the Non-Participating Royalty Owner by the Executive Interest*, 48 Ark. L. Rev. 933, 981–82 & n.116 (1995).  *But see id*. at 982 n.118 ("The question remains unanswered as to whether the fiduciary standard of *Manges* requires the executive to exact for the

37

non-executive the highest royalty obtainable."). The basis for this position is due to

> [t]he problem that peculiarly haunts non-participating royalty interests to a fraction of royalty[:] . . . [T]he [NPRI fraction of royalty] owners do not participate in the leasing of the land which determines the quantum of lease royalty that they will receive from production. The owner of the executive right to the mineral estate negotiates and executes the oil and gas lease which fixes the amount of bonus, delay rentals and royalty to be paid under the lease. Thus, *absent a judicial standard regulating the conduct owed by the owner of the executive right to the non-participating royalty owner, the latter would be at the mercy of the former as to the share of royalty received under the lease*.

*Id.* at 972–73 (emphasis added) (footnotes omitted) (noting that the evolution of the standard of care imposed on the executive right holder "has not been uniform or without controversy").

## (c) Self-Dealing

The presence or absence of evidence of self-dealing by the executive rights holder plays a role under both the cotenancy and terms-of-the-deed theories. One of the most clear cut examples of self-dealing is a 1997 Austin case, *Luecke v. Wallace*. In *Luecke*, Wallace reserved an undivided 1/2 NPRI and an undivided 1/2 interest in any bonus money exceeding $50 per acre when she conveyed the rest of her interest in a 303-acre tract to Luecke's predecessor. 951 S.W.2d at 270. Luecke's deed was made expressly subject to Wallace's reservation. *Id.* at 271.

Luecke initially negotiated an agreement to lease the tract after Union Pacific offered him a 1/5 royalty and $150/acre bonus. *Id.* When Union Pacific

found Wallace's reservation during a title search, it told Luecke that he had to provide Union Pacific with evidence of payment of 1/2 of excess bonus money above $50 per acre and a ratification and rental division order setting forth the interest division. *Id.* Instead, Luecke leased the tract to Tex-Lee, a company that he was the president and sole owner of, for 1/8 royalty and less than $50 per acre bonus. *Id.* Tex-Lee then sold its lease to Union Pacific for the $150-acre bonus and an overriding 1/5 royalty. *Id.* Although Luecke orally represented to Union Pacific that Wallace was "on board" with the lease, Wallace did not know anything about it. *Id.*

After Wallace sued Luecke for breach of fiduciary duty, the trial court granted Wallace's two motions for partial summary judgment, finding that she was an NPRI owner, that Luecke held the executive rights when he executed the lease, that Luecke owed Wallace a duty to obtain for her every benefit that he obtained for himself or his wholly owned corporation Tex-Lee, and that Wallace was entitled to her share of the additional royalty. *Id.* at 271–72. The trial court then held a trial on the merits to determine damages. *Id.* at 272.

In affirming the trial court's judgment, the Austin court relied on *Manges* to reason as follows:

> Luecke and Tex-Lee argue that, to establish a breach of this duty on summary judgment, Wallace would have had to establish that *she* could have made a better deal than the one-eighth royalty and the less than fifty dollar per acre bonus that Luecke received from Tex-Lee. We disagree. Wallace only needed to establish that Luecke obtained benefits for himself that he did not obtain for Wallace. The undisputed summary judgment evidence establishes

39

the following: (1) Union Pacific offered to lease the 303-acre tract from Luecke for a one-fifth royalty and $150 per acre bonus; (2) Luecke restructured the transaction so that Tex-Lee would receive the $150 per acre bonus and one-fifth royalty and Luecke individually would only receive from Tex-Lee a one-eighth royalty and less than $50 per acre bonus; and (3) Luecke received from Tex-Lee all of the bonus money Tex-Lee received from Union Pacific. Clearly, the lease from Luecke to his captive corporation, Tex-Lee, was a sham transaction entered into for the sole purpose of depriving Wallace of her full interest. This evidence establishes as a matter of law that Luecke, as owner of the executive right, did not obtain for Wallace every benefit he obtained for himself.

The trial court did not err in granting Wallace partial summary judgments because (1) it properly construed the unambiguous reservation in the 1984 deed and (2) it correctly concluded that Luecke breached the fiduciary duty he owed Wallace.

*Id.* at 274–75; *see also Shelton v. Exxon Corp.*, 719 F. Supp. 537, 544–45 (S.D. Tex. 1989) (noting that Texas cases finding breach of "fiduciary" duty in oil and gas law have involved disproportionate benefits or inappropriate consideration inuring to the executives under the terms of the contract or lease or as a result of its execution, including an element of unjust enrichment or self-dealing), *aff'd in part, rev'd in part*, 921 F.2d 595, 600 (5th Cir. 1991) (noting that the Texas Supreme Court has explained that the duties of the executive arise from the relationship itself and the inherent potential for abuse, particularly if the executive rights holder manipulates lease terms so that benefits usually shared by all mineral owners inure solely to the executive's benefit).

### (3) Further Refinement of the Law by the Texas Supreme Court, 2003–Present

In 2003, the supreme court continued on its path of referring to the "fiduciary" duty owed by the executive in *In re Bass*, 113 S.W.3d 735 (Tex. 2003) (orig. proceeding), even though the way the duty has been viewed and applied in oil and gas law has varied substantially from its application in other areas of law.[12] In *Bass*, NPRI owners sought discovery of the mineral estate owner's geological seismic data to prove that the mineral estate owner had breached an implied duty to develop the land. *Id.* at 737. The court stated that the NPRI owners had confused a fiduciary duty with the duty to develop; these duties evolved under different legal theories, and the court explained this, stating,

> [A] duty to develop a mineral estate arises not from a fiduciary relationship, but from the implied covenant doctrine of contracts law in which courts read a duty to develop into an oil and gas lease when necessary to effectuate the parties' intent. Conversely, a fiduciary duty arises out of agency law based upon a special relationship between two parties.

*Id.* at 743 (citations omitted).

---

[12]*See* Patrick H. Martin, *Unbundling the Executive Right: A Guide to Interpretation of the Power to Lease and Develop Oil and Gas Interests*, 37 Nat. Resources J. 311, 376, 397 (1997) (noting that "fiduciary" in the context of executive and nonexecutive rights is not used in the strictest sense of the term and that it should not be treated as a true fiduciary standard because to do so would turn the relationship of the executive and nonexecutive "on its head and deprive[] the executive right holder of his bargain"); *see also* Bruce M. Kramer, *A Renaissance Year for Oil and Gas Jurisprudence: the Texas Supreme Court*, 18 Tex. Wesleyan L. Rev. 627, 657 (2012) (stating that "as courts and commentators have noted, it is clear that the standard described in *Manges* is not the classic, self-sacrificing fiduciary duty that applies to trustee/beneficiary and attorney/client relationships").

The court distinguished *Schlittler* by stating that it had "involved a very narrow duty in which a grantee, *after* executing a mineral lease, owes a duty of the utmost fair dealing to protect the amount of the grantor's royalty. The [*Schlittler*] duty, therefore, arises in conjunction with the execution of a lease." *Id.* at 744. Because the relator in *Bass* had not yet executed a lease, the court held that no duty to protect the amount of the NPRI owners' royalty reservation had yet arisen. *Id.* The court went on to state that even if the relator had executed an oil and gas lease, the royalty reservation amount was explicitly stated in the deed, in contrast to *Schlittler*.[13] *Id.* Thus, if and when a lease was executed, the relator would be aware of exactly how much to pay the NPRI owners. *Id.*

The court stated that *Manges* had extended the *Schlittler* duty by creating a fiduciary duty between executive and non-executive interest holders (which include NPRI holders) in mineral deeds for the executive to acquire every benefit for the non-executive that the executive would acquire for himself. *Id.* at 745. The court distinguished *Bass* from *Manges*, *not* on the cotenancy basis— although it acknowledged that *Manges* involved a dispute between mineral estate cotenants—but by pointing out that there was no evidence of self-dealing because no leasing to anyone had occurred yet. *Id.* "Because [relator] has not

_____

[13]In *Schlittler*, the court construed the term royalty reservation as one-half "of such royalty as may be reserved in any oil, gas, or mineral lease which may be executed" by the executive rights holder. 101 S.W.2d at 544–45. In contrast, the *Bass* NPRI owners possessed a flat 1/3 of a 1/8 NPRI in the land at issue. 113 S.W.3d at 738.

42

acquired any benefits for himself, through executing a lease, no duty has been breached." *Id.*; *see also PYR Energy Corp. v. Samson Res. Co.*, 470 F. Supp. 2d 709, 722 (E.D. Tex. 2007) ("The issue of the duty of the holder of such a right arises when the 'executive' executes a lease that affects some other person's interest as well as the executive's.").

Most recently, the supreme court addressed the executive rights holder's duty in *Lesley v. Veterans Land Board. of the State of Texas*, 352 S.W.3d 479 (Tex. 2011), another deed construction case. In *Lesley*, a land developer who owned part of the mineral estate and all of the executive right, imposed restrictive covenants limiting oil and gas development in a subdivision to protect lot owners from intrusive exploratory, drilling, and production activities. *Id.* at 481. The NPRI owners complained that the developer, as the executive, had breached his duty to them. *Id.*

The court restated that one of the case's principal issues was "the nature of the duty that the owner of the executive right owes to the non-executive interest owner, and whether that duty has been breached." *Id.* at 487. It noted that

> [i]f the exclusive right to lease the minerals could be exercised arbitrarily or to the non-executive's detriment, the executive power could destroy all value in the non-executive interest, appropriating its benefits for himself or others. The law has never left non-executive interest owners wholly at the mercy of the executive. But the variety of non-executive interests and the reasons for their creation, and the effects of changing circumstances, make it difficult to determine precisely what duty the executive owes the non-executive interest.

43

*Id.* at 487–88 (footnotes omitted). The court summarized the duty described in *Schlittler* as "to negotiate a fair royalty," before stating that it had characterized an executive's duty of utmost fair dealing as fiduciary in nature. *Id.* at 488–89 (citing *Andretta* and *Manges*). The court clarified that *unlike* an agent-principal fiduciary duty, the executive's duty is to acquire for the non-executive every benefit that he exacts for himself,[14] before concluding that by filing the restrictive covenants that prohibited drilling, the executive had breached its duty to the NPRI owners. *Id.* at 490–91. Although the court referred to *National Plan Administrators* when it distinguished the traditional fiduciary duty between agent and principal from the one owed by an executive rights holder in oil and gas law, it did not otherwise apply or discuss the case in determining, once more, the issue of the executive's duty to the NPRI holder.[15] *See id.* at 490 & n.72.

---

[14]In its discussion of *Manges*, the court stated that while

> a fiduciary duty often, as it would for agent and principal, "requires a party to place the interest of the other party before his own," . . . we did not suggest in *Andretta*, *HECI*, or *Manges* that this requirement was part of the executive's duty. Rather, we stated in *Manges* that the executive's duty is to "acquire for the non-executive every benefit that he exacts for himself."

*Lesley*, 352 S.W.3d at 490 (footnotes omitted).

[15]The court also modified its earlier position in *Bass*, stating that when an executive refuses to lease, if the refusal is arbitrary or motivated by self-interest to the NPRI owner's detriment, the executive may have breached his duty. *Lesley*, 352 S.W.3d at 490–91.

44

### (4) Analysis

After *Bass* but prior to *Lesley*, cases like *Marrs & Smith Partnership v. D.K. Boyd Oil & Gas Co.* relied on *Hlavinka*'s footnote. *See* 223 S.W.3d 1, 14–15 (Tex. App.—El Paso 2005, pet. denied) (tracing the development of the law and citing *Hlavinka* for the proposition that "[c]ases interpreting *Manges* have concluded that when the executive and non-executive are co-tenants in the mineral estate and there is a relationship of trust and confidence between the parties, a fiduciary relationship exists between the executive and non-executive mineral interest owner"). However, we think that *Bass* and *Lesley* make it appear that the supreme court has chosen to follow a relationship theory based on the terms of the NPRI reservation and on the presence or absence of self-dealing. Therefore, after *Lesley*, our prior holdings in *Hawkins* and *Dearing* remain the proper course to follow with regard to the determination of a duty and the applicable standard. *See also Friddle v. Fisher*, 378 S.W.3d 475, 481–82 (Tex. App.—Texarkana 2012, pet. filed).

Based on our review of the development of this area of law, the level of duty owed by the executive rights holder depends on the amount of control placed in his or her hands by the terms of the NPRI reservation itself—i.e., whether a fraction of royalty or a fractional royalty is reserved. As we previously determined in *Bradshaw I* that Bradshaw's NPRI here is a fraction of royalty, *see* 266 S.W.3d at 496, Steadfast owed Bradshaw a "fiduciary" duty under the existing body of oil and gas law. And because Bradshaw presented some

45

evidence that a 1/8 royalty was below market for Hood County at the time Steadfast leased the property to Range, that a higher royalty had originally been contemplated by Steadfast, and that the per acre bonus was higher than what was customary in Hood County at that time, a fact question remains as to whether Steadfast breached its duty by obtaining the minimum 1/8 royalty unless Steadfast's estoppel by deed argument prevails.

### b. Estoppel by Deed

Steadfast also argues that Bradshaw's claim is barred by the affirmative defense of estoppel by deed.

Estoppel by deed prevents a party from claiming a position inconsistent with a grant and precludes parties to a valid instrument from denying its full force and effect by binding them to the recitals, reservations, and exceptions in the deed. *Angell v. Bailey*, 225 S.W.3d 834, 841–42 (Tex. App.—El Paso 2007, no pet.). Here, however, estoppel by deed does not preclude Bradshaw from arguing that Steadfast breached its duty because Bradshaw is not attempting to invalidate a recital or reservation in the 1960 Deeds; instead, Bradshaw argues that Steadfast has breached a duty that arose from their relationship and that was owed to her when Steadfast obtained an oil and gas lease. *See Manges*, 673 S.W.2d at 183 ("The fiduciary duty arises from the relationship of the parties and not from contract."). Further, Bradshaw has not attempted to deny the 1960 Deeds' validity nor to deny that Steadfast has the exclusive executive right to lease the minerals. Rather, as discussed in *Bradshaw I* and above, the

46

reservation in the deeds establishes a "floor for the royalty," and the duty arises from the relationship of the executive and NPRI owner. *See Bradshaw I*, 266 S.W.3d at 496; *see also Lesley*, 352 S.W.3d at 490–91; *Manges*, 673 S.W.2d at 183. Therefore, we conclude that estoppel by deed does not apply, and we sustain Bradshaw's first issue.

## C. Range's Summary Judgment

### 1. Range's Motion

Range filed a motion for summary judgment against Bradshaw in July 2010. In its motion, Range argued that Bradshaw's sole claim against it was that it had conspired with Steadfast to commit a tort and that since the trial court had determined that Steadfast had not committed a tort as a matter of law, Range could not be liable for conspiracy to commit a tort or for aiding or abetting the commission of a tort.

Range further argued that even if the trial court had not previously determined that Steadfast had not committed any tort, summary judgment would still be appropriate because Range had an absolute legal right to enter into arm's-length negotiations and contract with Steadfast for the oil and gas lease at issue. It also complained that because it had no duty to Bradshaw, her claims for conspiracy and aiding and abetting were negated as a matter of law and were also precluded by the defenses of privilege and justification.

Range attached to its motion the exhibits that were attached to Steadfast's second motion for summary judgment,[16] as well as a copy of the oil and gas lease between Steadfast and Range showing the 1/8 royalty and referencing the cash bonus. Range asked the trial court to take judicial notice of the contents of its file, including the live pleadings, Steadfast's second summary judgment motion, and the trial court's order granting Steadfast's second motion.

### 2. Bradshaw's Response

In her response to Range's motion, Bradshaw conceded that unless Steadfast had breached a duty to her, Range would not be liable to her for aiding and abetting or conspiracy. But she argued that because Steadfast owed her a duty that it had breached, her claims against Range were still valid. Bradshaw further argued that neither of the affirmative defenses that Range claimed applied to her claims because her conspiracy and aiding and abetting claims were based on a breach of a duty sounding in tort, not on a contract or on interference with a contract.

### 3. Bradshaw's Second Issue

In her second issue, Bradshaw contends that the trial court erred by granting summary judgment for Range on her conspiracy and aiding and abetting claims against Range. Specifically, she complains that (1) Range's summary

---

[16]The Steadfast exhibits incorporated by Range, as set out above in our discussion of Bradshaw's first issue, consisted of Steadfast's first request for admissions from Bradshaw and her responses and R.J. Sikes's affidavit with its attached exhibit of the April 2006 contract of sale with Range.

48

judgment motion was based primarily on the trial court's ruling that Steadfast did not breach any duty to her; (2) Range failed to meet its summary judgment burden of conclusively negating an essential element of her claims; (3) the affirmative defenses of justification and privilege do not apply to her claims; and (4) Range did not offer any summary judgment evidence to support these affirmative defenses.

Range responds that the trial court properly rendered summary judgment on Bradshaw's claims against it because: (1) Steadfast did not commit an underlying tort; (2) Range had an absolute right to enter into arm's length negotiations to advance its own financial, legal, and business interests; (3) the uncontroverted summary judgment evidence negated elements of Bradshaw's conspiracy claim; and (4) Range was privileged and justified in exercising its legal rights in negotiating the transaction with Steadfast.

Because we have concluded above that Steadfast, in fact, owed Bradshaw a duty and that a fact issue remains with regard to whether Steadfast breached this duty, we sustain the first portion of Bradshaw's second issue. Further, because the underlying tort—Steadfast's alleged breach of duty—is the basis for Bradshaw's civil conspiracy and aiding and abetting claims against Range, we sustain the second portion of Bradshaw's second issue. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (op. on reh'g) (stating that civil conspiracy is a derivative claim of an underlying tort for which the plaintiff "seeks to hold at least one of the named defendants liable"); *Anderton v. Cawley*, 378 S.W.3d 38, 54

49

(Tex. App.—Dallas 2012, no pet.) (concluding that when the trial court erred by granting summary judgment on breach of fiduciary duty, it also erred by granting summary judgment on the derivative claim for aiding and abetting breach of fiduciary duty); *see also Mims*, 810 S.W.2d at 880–81 (stating that a lessee can be held liable to the NPRI owner if the lessee induces or participates in the executive's breach or agrees with the executive to an arrangement made to exclude or minimize the NPRI owner's benefits).

And while a defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense, to accomplish this, as pointed out by Bradshaw, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense, which Range has not done.[17] *See Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *see also* Tex. R. Civ. P. 166a(b), (c); *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008). Therefore, we sustain the remainder of Bradshaw's second issue.

---

[17]The only evidence Range attached to support its contention that the transaction was at arm's length was Sikes's affidavit, in which Sikes claimed that there was no self-dealing, conspiracy, or collusion in negotiating and entering the transaction between Steadfast and Range. Range did not produce any evidence from its own representatives about the transaction. And while in his affidavit, Sikes asserts that Steadfast did not take any overriding royalty interest, any oil payment, or any bonus royalty, he does not address the amount of the cash royalty mentioned in the lease. Further, based on Bradshaw's summary judgment evidence, fact issues remain regarding the alleged underlying tort, making summary judgment improper.

**D. Summary Judgment on Constructive Trust and Fraud Claims**

   **1. The Royalty Holders**

Three days prior to the filing of Bradshaw's first amended petition, the Royalty Holders filed their second motion for summary judgment, opposing the imposition of a constructive trust and arguing that the undisputed summary judgment evidence showed that Bradshaw had no interest in the identifiable res—their shares of the royalty interest—and that Bradshaw could not establish unjust enrichment. These parties supplemented their motion after Bradshaw filed her second amended petition to add a request for summary judgment on Bradshaw's "recently concocted claim for imposition of a constructive trust on the accrued royalties payment made and to be made in the future as a result of [the Royalty Holders'] ownership of a fractional royalty interest," and they filed their third motion for summary judgment in July 2010 to address Bradshaw's claims under the Uniform Fraudulent Transfers Act (UFTA).

In their third motion, the Royalty Holders argued that the trial court's ruling on Steadfast's second motion for summary judgment conclusively established that Steadfast did not have a "debtor" relationship with Bradshaw at the time of the transfers of the fractional royalty interests to the Royalty Holders, conclusively negating Bradshaw's UFTA claims. They also argued that there was no evidence to support Bradshaw's claim that the transfers to them by Steadfast were "fraudulent" under business and commerce code sections 24.005(a), 24.005(b), or 24.006.

51

## 2. Bennis

Bennis filed a no-evidence motion for summary judgment nine days after Bradshaw filed her first amended petition, stating that he and Humphreys had owned the right to purchase the Mitchell Ranch from Wise Asset, which they had assigned to Steadfast for a cash payment and a fixed NPRI of 1.5625% not tied to the lease between Steadfast and Range, before Steadfast sold the surface rights to, and entered into the oil and gas lease with, Range. Because he never owed Bradshaw a fiduciary duty, Bennis argued that there could be no breach that would support a constructive trust against him and that there was no evidence of his unjust enrichment. He also argued that there was no evidence that he had committed fraud against her.

Bennis filed a traditional and second no-evidence motion for summary judgment in July 2010 on Bradshaw's UFTA claim, but Bradshaw has abandoned this claim against Bennis on appeal.

## 3. Korb

Korb filed a motion for traditional and no-evidence summary judgment against Bradshaw on her constructive trust claim with regard to her breach of fiduciary duty and fraud arguments, arguing that as a matter of law, he owed Bradshaw no fiduciary duty, did not commit actual fraud, and had not been unjustly enriched and that there was no identifiable res to impose a constructive trust upon. Korb also argued that there was no evidence to support imposition of a constructive trust.

52

Korb filed his second traditional and no-evidence motion for summary judgment against Bradshaw in July 2010 on her UFTA claim. Bradshaw has abandoned her UFTA claim against Korb on appeal.

## 4. Bradshaw's Responses

In her response to Korb's and Bennis's motions for summary judgment, Bradshaw stated that her request for a constructive trust as to Korb's and Bennis's interests was based on the royalty amount set out in the Steadfast-Range lease, which affected the amount of the royalty proceeds that she, Korb, and Bennis were entitled to as NPRI holders based on Steadfast's breach of fiduciary duty, and that she otherwise claimed no right, title, or interest in the Bennis and Korb royalties. She also argued that she did not have to prove that Bennis and Korb owed her a fiduciary duty or perpetrated fraud on her in order to demonstrate a superior right to the proceeds and for the imposition of a constructive trust. Bradshaw attached thirty-seven exhibits to her response to Bennis and Korb's motions for summary judgment, including the email from Shipman to Humphreys, which was forwarded by Humphreys to Bennis, with regard to Steadfast's initial offer of a 25% royalty interest lease agreement as the "best alternative to avoid litigation regarding the Bradshaw interest," and an email from Bennis to Humphreys about whether there were other agreements with R.J. Sikes that resulted in the sale to Steadfast instead of to Chesapeake. She also attached part of Bennis's deposition, including his description of the April 17, 2006 meeting led by R.J. Sikes in which somehow Bennis received the interest

53

now in controversy, which we have already set out above. Additional exhibits included the April 27, 2006 special warranty deed from Wise Asset #2 to Steadfast; the April 27, 2006 special warranty deed from Steadfast to Range; the April 27, 2006 memorandum of paid up oil and gas lease from Steadfast to Range; and the April 27, 2006 royalty deed from Steadfast to Bennis.[18]

Bradshaw responded to the Royalty Holders' motions in her responses to Steadfast and acknowledged that the Royalty Holders, Bennis, and Korb would not be liable to her for fraudulent transfer if Steadfast had committed no breach of duty owed to her.

## 5. Bradshaw's Third and Fourth Issues

In her third issue, Bradshaw argues that the trial court erred by granting summary judgment on her claims against the Royalty Holders, Bennis, and Korb for the imposition of a constructive trust over the proceeds of the royalty interests possessed by them because: (1) this claim did not require her to show that Bennis or Korb breached a fiduciary duty to her or committed fraud against her; (2) the proceeds of the royalty interests held by the Royalty Holders, Bennis, and Korb are directly traceable to the royalty interest that Steadfast wrongfully deprived her of; (3) the Royalty Holders, Bennis, and Korb would be unjustly enriched if they were allowed to retain the proceeds of royalties that rightfully

---

[18]Bennis testified that on closing day, his attorney told him that the order of filing did not matter because everything was being signed at once.

54

belong to her; and (4) she presented more than a scintilla of evidence to support each of the challenged elements of her constructive trust claim.

In her fourth issue, Bradshaw argues that the trial court erred by granting summary judgment on her fraudulent transfer claims against the Royalty Holders because they were based, in large part, on the trial court's ruling that Steadfast did not breach any duty to her and because the summary judgment evidence raises a fact issue with regard to whether Steadfast's conveyances of the royalty interests to the Royalty Holders were fraudulent under the UFTA.

## 6. Constructive Trust and UFTA

A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment and may be imposed based on a fiduciary or confidential relationship or when there has been actual fraud. *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 878 (Tex. App.— Houston [14th Dist.] 2001, pet. denied) (op. on reh'g). To establish a constructive trust, the proponent must prove (1) the breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) the unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied).

In *Friddle*, one of the most recent cases to address the executive-NPRI "fiduciary" duty issue, the Texarkana court stated,

> If the holder of the executive right receives royalties pursuant to the rights held by an NPRI holder, he is chargeable in equity as constructive trustee with the duty to hold the royalty attributable to

55

the holder of the NPRI, whatever it may be, subject to the demand of the NPRI holder.

378 S.W.3d at 481 (citing *Andretta*, 415 S.W.2d at 641–42). In *Mims*, the same court stated that a constructive trust applies in cases of actual fraud as well as situations involving a breach of fiduciary duty. 810 S.W.2d at 881. And the supreme court has stated that the policy against unjust enrichment mandates that a third party not be allowed to retain property he receives as a beneficiary of another's fraud. *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984) (noting that a constructive trust can be imposed on a knowing or unknowing beneficiary of fraud, even if he is not the actual wrongdoer); *see also Pope v. Garrett*, 147 Tex. 18, 211 S.W.2d 559, 562 (1948).

Under the UFTA, a "debtor" is "a person who is liable on a claim," and a "creditor" is a person "who has a claim." Tex. Bus. & Com. Code Ann. § 24.002(4), (6) (West 2009). A "claim," under the UFTA, is "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id*. § 24.002(3). The sections following section 24.002 establish when a transfer by a debtor is fraudulent as to a creditor, the types of relief available (including avoidance of the transfer and equitable remedies), and the affirmative defense of good faith. *See id*. §§ 24.005–.006, .008–.009 (West 2009).

Steadfast leased the property to Range for a 1/8 royalty and sizable leasing bonus instead of a 1/4 royalty, thereby, as argued by Bradshaw, breaching its fiduciary duty to her by leaving her with only a 1/16 royalty (1/2 of the 1/8 royalty) instead of a 1/8 royalty (1/2 of the 1/4 royalty). Bradshaw seeks the difference between the royalty she actually received and the royalty she would have received had no alleged breach occurred, potentially affecting the distribution of proceeds under the present royalty to the Royalty Holders via the NPRI transfers by Steadfast, and she seeks to set aside the transfers to the Royalty Holders, which she argues are fraudulent.[19] *See Hubbard*, 138 S.W.3d at 485. As we have concluded that Steadfast owed a fiduciary duty to Bradshaw and that there is a genuine issue of material fact with regard to whether Steadfast breached that duty by engaging in self-dealing and conspiring with others to Bradshaw's detriment—one of the bases for Bradshaw's constructive trust and UFTA claims against the Royalty Holders—we cannot say that they were entitled to summary judgment as a matter of law. Therefore we sustain Bradshaw's third issue in part, and we sustain her fourth issue.[20] On remand, if the factfinder

---

[19]To the extent that Steadfast may have breached its duty to Bradshaw and then conveyed portions of its royalty interest to the Royalty Holders in an attempt to fraudulently evade her reach of the proceeds, Bradshaw may have a valid claim for constructive trust as to the Royalty Holders. However, because the breach issue has yet to be resolved by a factfinder, we cannot yet reach the merits of this issue based on the summary judgment record before us.

[20]The Royalty Holders, Bennis, and Korb own fixed fractional royalties. If the lease is reformed to reflect an increased overall royalty, then Steadfast may

57

concludes that no breach occurred, then these constructive trust and UFTA issues will be moot.

However, with regard to Bennis and Korb, because Bennis received his interest at the same time that Steadfast signed its agreements with Range, because there is no evidence that Bennis engaged in fraud or that Bradshaw would otherwise have an interest in the share that he—or by extension, Korb—received, and because Bradshaw has abandoned on appeal her UFTA claims against both of them, Bennis and Korb were entitled to summary judgment. Therefore, we overrule Bradshaw's third issue in part.

## IV. Conclusion

Having sustained Bradshaw's first, second, and fourth issues and having sustained part of her third issue, we reverse the trial court's orders granting summary judgment for Steadfast, Range, and the Royalty Holders and remand those claims to the trial court for further proceedings. Having overruled part of Bradshaw's third issue, we affirm the trial court's summary judgments for Bennis and Korb.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED: February 14, 2013

---

also have an NPRI in excess of what it granted to the others under the original lease providing for a 1/8 royalty.